UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | 1:11-cr-00095-JAW-1 |
| MICHAEL ANGELO GIUFFRIDA | ) ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | 1:11-cr-00095-JAW-2 |
| NOUR-EL-DEAN MOUNEIMNEH | ) ) | |

## RECOMMENDED DECISION

Defendants Michael Angelo Giuffrida and Nour-El-Dean Mouneimneh have filed motions to suppress evidence obtained from them as a consequence of an investigatory detention and canine "sniff search" of the rental vehicle in which they were traveling. (Docs. 56 & 61.) The Court referred the motions for report and recommended decision. I conducted a hearing on January 5, 2010, and offer the Court the following proposed findings of fact and recommendation concerning the Defendants' motions.

**PROPOSED FINDINGS OF FACT**

The United States (the "Government") bears the burden of demonstrating the lawfulness of the vehicle search. United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). To satisfy this burden, the Government called to the witness stand two law enforcement officers and introduced into evidence exhibits associated with a drug-

detection canine's training and certification, which were admitted without objection. Defendants offered no oral testimony of their own in support of their motions, but both introduced sworn testimony through affidavits. The sworn testimony and exhibits demonstrate, by a preponderance of the evidence, the following facts concerning the detention of Defendants and the search of the subject vehicle.

On March 26, 2011, at around 5:00 p.m., Defendants Giuffrida and Mouneimneh were traveling by car on US Route 1, northbound, in Houlton, Maine. Following at some distance in a marked service vehicle were US Border Patrol Agents Sean McDonough and Stele Huite. The agents watched as Defendants' car approached the intersection north of Interstate 95, at which travelers can turn left to a Wal-Mart store, turn right to a Big Stop truck stop and convenience store, or continue straight on US Route 1. Three lanes of traffic approach this intersection in the northbound route and the two left-most lanes are marked left-turn only. Defendants' car was in the far left lane when it suddenly veered right and crossed the other lanes to enter the Big Stop parking lot. In addition to seeing this traffic maneuver, the Agents observed that the car had a flat tire and that it had an out-of-state license plate. The Agents proceeded straight through the intersection but then decided to turn around to speak with the driver of the vehicle for public safety reasons. Agent McDonough[1] was also of the view that the situation was "something out of the ordinary" and he wanted to have a consensual encounter with the occupants of the car.

---

[1] Agent McDonough testified at the hearing. Agent Huite did not testify.

Defendants' car was already parked and Defendant Giuffrida was already in the convenience store when Agent McDonough approached the vehicle.  Before approaching the vehicle the agents ran the plates and determined that the car was a rental.  McDonough knocked on the passenger window, where Defendant Mouneimneh sat, and started a conversation.  McDonough told Mouneimneh that the car had a flat tire that he might want to take a look.  Mouneimneh's response was not described.  McDonough asked where the men were traveling from and Mouneimneh responded that they had come from Canada.  McDonough asked to see Mouneimneh's passport, which Mouneimneh supplied.  McDonough asked where Mouneimneh entered the United States and Mouneimneh appeared to be confused by the question, or unable to recall, before responding that he had entered in New York and that McDonough would have to ask Giuffrida about his own entry when he came back from inside the store.  Giuffrida came out of the store and the process repeated.  Giuffrida reported that he was a Canadian, produced his passport, and said he had entered the United States in Ohio.  He indicated that Mouneimneh had not entered the country with him and was unable to explain how the two men had come to be traveling together.  Agent McDonough asked Giuffrida whether he had a spare tire, but Giuffrida responded with an inquiry about where he might purchase a tire.  McDonough found this response to be curious in light of the fact that the car was a rental car.

At this point, Agent McDonough left the men with Agent Huite and went to the service car to run the passports "through the system."  What the system reported back to Agent McDonough was that Giuffrida had an "inadmissible charge" associated with his

3

passport and that there was no entry information available for Mouneimneh. McDonough decided to detain the men and bring them a mile up the road to the Border Station so he could investigate further. The Agents drove the men to the Station. Someone at the Station scanned the men's finger prints,[2] but they were otherwise not cuffed, locked up, or handled. At the Station, agents "looked into" the entry information and learned that Giuffrida was denied entry at a New York port of entry, McDonough called the immigration office there to inquire. What he learned was that the denial of entry related to "conflicting statements" given on March 12, 2011, and that Giuffrida's cell phone had contained some undisclosed evidence of narcotics trafficking. McDonough also learned that Giuffrida later made his way into the United States by obtaining "pre-clearance" in Toronto and flying to Ohio.

Agent McDonough determined that this information did not supply a valid basis to continue detaining the men. He told the men as much and said that he would return them to their car but would like to run a dog around the car. Giuffrida has filed a declaration attesting that he said he did not want the agents to search the car and that there were no drugs in the car. (Doc. No. 61-1, ¶ 11.) Agent McDonough testified that Giuffrida consented to the dog going around the car. Based on Agent McDonough's testimony and

---

[2] The Government's responsive brief describes this system as follows:

> [B]oth subjects were brought in for IDENT (the Department of Homeland Security's Automated Biometric Identification System) fingerprint checks. Combined with the Integrated Automated Fingerprint Identification System (IAFIS) it allows agents to simultaneously search the FBI's fingerprint database and provides rapid identification of individuals with outstanding criminal warrants through electronic comparison of ten-print digital fingerscans against a vast nationwide database of previously captured fingerprints.

(Doc. No. 65 at 4.)

4

Officer Hammond's presence on the scene ahead of Agent McDonough's and Defendants' return to the parking lot (described below), I find that Agent McDonough had already arranged for the search to take place by the time he informed Defendants that they would be returned to the parking lot and that an open-air dog search was already set in motion without regard to any consent by Defendants. By the time they arrived back at the Big Stop, Officer Gerald Hammond of Customs and Border Protection was already on the scene with his canine, Dorsta, and he had already run Dorsta around the car. Agent McDonough may have said to Defendants that he would "like" to run a dog around the car, but in fact this act was already set in motion. Consent had nothing to do with the open-air search of the vehicle.

According to Officer Hammond's testimony, which I credit, Officer Hammond began at the driver-side corner of the front bumper and led Dorsta around the front of the vehicle and down the passenger side.[3] After Dorsta reached the rear tire, she darted under the trunk area and came up and sat behind the car. Officer Hammond interpreted the darting behavior as an alert and understood Dorsta's sitting behind the trunk to be her "final response." Based on his testimony about Dorsta's certifications and training and Officer Hammond's experience with her, Officer Hammond's interpretation was reasonable.

When Agent McDonough returned to the scene with Giuffrida and Mouneimneh, Hammond told him that Dorsta had alerted on the trunk. The agents told Giuffrida and

---

[3] Officer Hammond explained that, according to regulations, even though he is with Customs and Border Protection, he could only do an "open air" search with Dorsta—around the outside of the vehicle—because the search did not occur at the border crossing.

5

Mouneimneh that they needed the keys to enter the vehicle. Giuffrida refused to give consent and one of the agents explained, in a loud voice, that Giuffrida had no choice in the matter. Giuffrida surrendered the keys and Officer Hammond introduced Dorsta to the front seats without any alert. He then introduced her to the back seat and she ran back and forth along the seam of the rear seat sniffing "intently." Officer Hammond then brought Dorsta out and she once again alerted on the trunk. Officer Hammond opened the trunk and Dorsta jumped into the trunk and went "berserk," digging at the spare tire cover on the floor of the trunk. Officer Hammond told her to calm down and she sat. Officer Hammond and the agents removed some duffle bags from the trunk, opened the spare tire well, and found a plastic bag containing a large quantity of currency.

Having removed both the duffle bags and the bag of cash from the trunk to access the spare tire well, Officer Hammond separated the duffle bags from the cash bag and reintroduced Dorsta to the duffle bags. According to Officer Hammond, whose testimony I found most credible, Dorsta was uninterested in the duffle bags and went straight to the bag of cash and sat down.

Dorsta is certified in narcotics detection and human detection. She is not certified in currency detection, though some canines are. Officer Hammond agrees with the proposition that he does not know what Dorsta smells when she alerts. He also agrees with the proposition that Dorsta might react to the smell of something other than narcotics or hidden persons, in particular the markings of another dog, in such a way that someone might interpret her behavior as an alert. However, Dorsta has been certified in narcotics detection and human detection, has passed with flying colors, and has

6

undergone on-the-job training in the field on a daily basis, including many negative responses with open-air searches on cars. Officer Hammond reliably explained that "every single day" there are negative responses on cars. Officer Hammond admitted that he had not later run tests on the currency to determine what the odor was and that he has not run "negative tests" with Dorsta involving currency known to be free of the smell of narcotics. However, Officer Hammond also reliably testified that currency often holds the smell of narcotics.

Mr. Giuffrida's counsel recalled Agent McDonough to the stand and asked McDonough if Dorsta had alerted to the duffle bags. Agent McDonough said she had. Counsel then asked if he had been told that Dorsta alerted to the duffle bags. McDonough said he had. Counsel asked whether cash was found in the duffle bags and McDonough said less than $100. Whatever inferences might be drawn as to what Agent McDonough understood about whether Dorsta alerted "on the duffle bags," Officer Hammond's testimony was entirely persuasive that Dorsta had not and that, once the duffle bags were out of the trunk, she had no interest in them and went and sat down next to the bag of currency.

## DISCUSSION

Defendant Mouneimneh's motion to suppress asserts that there was no probable cause to support the search of the rental vehicle, posits that Dorsta's alerts were not reliable or that she did not alert at all, questions whether Dorsta had a valid certification at the time, and contends that she erroneously alerted because no narcotics were found in the trunk of the vehicle. (Doc. No. 56 at 3-7.) Relying on the "fruit of the poisonous

tree" doctrine, Defendant Mouneimneh requests the suppression of all evidence acquired as a result of this warrantless search, arguing that "entirety of the discovery/evidence in this case finds as its genesis materials seized from the trunk." (Id. at 8.) Mouneimneh objects to any contention that Co-Defendant Giuffrida consented to a search of the vehicle, asserting that Mr. Giuffrida "relented" to demands for the keys made in the context of an alleged dog alert. (Id. at 9.) In his reply to the Government's response, Mouneimneh rebuffs a contention that he lacks standing to object to the search because he was not identified on the rental paperwork. He offers an affidavit in which he represents that there were roughly 12 days in which he shared use and occupancy of the vehicle with Giuffrida, including shared driving duties, and that he held a subjective expectation of privacy in relation to personal property stored and carried in the vehicle. (Doc. No. 67 at 1-4; Doc. No. 67-1.) Mouneimneh also argues in reply that Dorsta was an unreliable drug-sniffing canine because she alerted not on narcotics but on cash. (Doc. No. 67 at 4-5.) Mouneimneh suggests a list of possible items that might have been found in the trunk, likening a bag filled with tens of thousands of dollars to a sleeping bag, a loaf of bread, or a soccer ball. (Id. at 5.) Finally, Mouneimneh observes that Agent McDonough's report did not describe the nature of the dog alert and argues that new information about the nature of the dog alert should be viewed skeptically. (Id. at 6.)

Defendant Giuffrida's motion to suppress is in harmony with Mouneimneh's motion. In it he posits, correctly in my view, that the open-air sniff search of the vehicle likely transpired before the border agents returned Defendants to the parking lot. (Doc. No. 61.) However, in a post-hearing, supplemental memorandum, Giuffrida argues that

the hearing resulted in evidence that the detention was unlawfully extended by "several minutes" so that Agent McDonough could place a call to request a dog sniff in the parking lot. (Doc. No. 104 at 2-3, citing Illinois v. Caballes, 543 U.S. 405, 407 (2005).) Additionally, Giuffrida maintains that the evidence indicates that "the use of a drug dog in these circumstances was unreasonable." (Id.) Giuffrida contends that Dorsta is an unreliable detection dog because Officer Hammond testified that she has alerted on currency before and because she alerted on currency in this case, including small quantities of currency in the duffle bags. (Id. at 2, 3-4.) Finally, Giuffrida argues that any alert in this particular case is rendered less reliable from a probable cause perspective because the agents understood that the vehicle was a rental. (Id. at 4.) Defendant Mouneimneh's post-hearing, supplemental briefing joins in these additional arguments. (Doc. No. 105.)

The Defendants' motions should be denied because the duration of the detention was not extended by the dog search, which was underway before Defendants returned to the parking lot from the Border Station, and because the Government has established that Dorsta alerted on the trunk of the vehicle and that her alert was reliable.

### A. Defendant Mouneimneh's Expectation of Privacy

"Because Fourth Amendment rights are personal and may not be asserted vicariously, the first inquiry in examining a fourth amendment claim is whether the defendant had a legitimate expectation of privacy in the area searched or the item seized." United States v. Sanchez, 943 F.2d 110, 112 (1st Cir. 1991). The Government's initial response to the motion was to the effect that Defendant Mouneimneh, a passenger at the

time of Agent McDonough's arrival, lacked a legitimate expectation of privacy in the interior compartments of the vehicle and, therefore, could not challenge the legality of the search. This discussion assumes that Mouneimneh held a reasonable expectation of privacy with respect to the trunk and other interior spaces of the vehicle based on several days of shared operation of the vehicle with Defendant Giuffrida and Mouneimneh's use of the vehicle to transport his personal belongings over that time.

**B.     Consent is Not the Issue**

Arguments made in the initial briefs and in the Government's response suggested that the outcome of this case might turn on the existence or non-existence of Defendant Giuffrida's consent to the search. "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Officers need not have a warrant to search when a person has authority to give consent to a search and freely and voluntarily gives consent. United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008). The evidence presented at the hearing reveals that both the open-air dog-sniff and the subsequent search of the car interior were performed without consent.

**C.     The Open Air, Canine Sniff Was Not Subject to the Fourth Amendment's Warrant Requirement and the Canine's Alert Supplied Probable Cause to Search the Interior of the Vehicle.**

The Government maintains that the open air search of the vehicle in a public parking lot "was not a search under Fourth Amendment law" and that Dorsta's alert supplied probable cause for the search of the vehicle's passenger compartment and trunk,

10

in light of her training and certifications. (Doc. No. 65 at 9-16; Doc. No. 66 at 7-14.) As a general rule, an alert by a well-trained detection dog that is with an officer who is legitimately on the scene does not rise to the level of a Fourth Amendment concern because individuals do not have a legitimate expectation of privacy in the odor emitted by contraband items in their possession. Illinois v. Caballes, 543 U.S. 405, 408-409 (2005)[4]; United States v. Place, 462 U.S. 696, 707 (1983). Stated otherwise: "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Caballes, 543 U.S. at 410.

Defendants dispute whether Dorsta was well-trained in narcotics detection and they argue that Dorsta alerted on a bag filled with cash rather than on a bag containing narcotics. They also emphasize Officer Hammond's concession that this was not the first time Dorsta alerted on currency. Contrary to Defendants' argument, I found Officer Hammond's testimony and Dorsta's certification records reassuring. Dorsta is a well-trained and reliable narcotics-detection canine with a solid performance record. She daily sniffs the air around vehicles without alerting to the presence of contraband drugs, which proves that she does not routinely alert on vehicles. Officer Hammond's testimony also persuaded me that a large quantity of currency will frequently exude an odor of

---

[4] The question considered by the Court in Caballes was: "Whether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." 543 U.S. at 407. The Court made it plain that it "proceed[ed] on the assumption that the officer conducting the dog sniff had no information about respondent except that he had been stopped for speeding" and that the dog sniff was, therefore, not based on any reasonable articulable suspicion. Id.

contraband drugs.[5] Giuffrida's counsel made much of the fact that Agent McDonough testified that Dorsta alerted on the duffle bags, which contained small amounts of cash. However, contrary to this testimony, Officer Hammond far more persuasively testified that Dorsta was powerfully drawn to the plastic bag containing the currency and was not interested in the duffle bags. Moreover, it is more likely than not that Agent McDonough's reference to an alert "on the duffle bags" was in reference to Dorsta's alert from inside the trunk of the car, before the duffle bags were removed, a point in time when Dorsta was digging at the spare tire compartment rather than at the duffle bags. In other words, the officers' testimony on this issue is consistent, more likely than not, because Dorsta was over the duffle bags when she was in the trunk. Agent McDonough likely testified that Dorsta alerted on the duffle bags for this reason.

Officer Hammond's use of Dorsta to conduct a canine-assisted, open-air search around the exterior of the vehicle, in and of itself, did not implicate the Fourth Amendment prohibition against unreasonable searches because Officer Hammond was legitimately in the public parking space and Defendants had no legitimate expectation of privacy in the odors that contraband items were emitting into the open air around the vehicle. The Fourth Amendment was implicated, however, after Dorsta alerted on the trunk and the officers demanded the keys to search the vehicle interior.

The Fourth Amendment prohibits the federal authorities from conducting unreasonable searches, U.S. Const. amend. IV, and "searches conducted outside the

---

5     See, e.g., United States v. McDowell, No. 09-20133-JWL, 2010 WL 5288149, *4-5, 2010 U.S. Dist. Lexis 134010, *12-15 (D. Kan. Dec. 16, 2010) (slip op.) (finding reliable a dog that alerted to residual amounts of narcotics on a large quantity of currency).

12

judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted). For present purposes, the relevant exception to the warrant requirement is the "automobile exception." Pursuant to this exception, officers "who have legitimately stopped an automobile[6] and who have probable cause to believe that contraband is concealed somewhere within it" are permitted to "conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant." United States v. Ross, 456 U.S. 798, 800 (1982). This exception is grounded on the fact that ,"historically[,] warrantless searches of vessels, wagons, and carriages—as opposed to fixed premises such as a home or other building—had been considered reasonable by Congress." Id. at 805. According to the Supreme Court: "individuals always had been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate's prior evaluation of those facts." Id. at 807 n.8. "Given the nature of an automobile in transit . . . an immediate intrusion is necessary [and] a warrantless search of an automobile is not unreasonable." Id. at 806-807. Because this exception is premised on probable cause, officers must have knowledge of objective facts sufficient to justify the issuance of a warrant to search the vehicle. Id. at 808-809. Where there is probable cause to search an entire vehicle, officers may also search containers and packages found inside the vehicle

---

6     Defendants were not "stopped" in this case and they have not challenged the legitimacy of their detention based on immigration concerns.

that "might contain the object of the search." Id. at 821. "The scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause." Id. at 823. See also United States v. Lopez, 380 F.3d 538, 544-45 (1st Cir. 2005).

"Probable cause exists where 'the facts and circumstances within . . . [the officers'] knowledge of which they had reasonably trustworthy information are sufficient . . . to warrant a man of reasonable caution in the belief that' an offense has been committed" or that contraband is present. Brinegar v. United States, 338 U.S. 160, 175-176 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). In light of Dorsta's training and certifications and Officer Hammond's experience with her, Officer Hammond's observation of an alert at the trunk of the car supplied him with probable cause to believe that the trunk contained either contraband drugs or a person. Illinois v. Caballes, 543 U.S. 405, 409 (2005) (holding that dog sniff supplied probable cause to search vehicle's trunk). Officer Hammond reliably testified that currency often holds the smell of narcotics. Based on this testimony it is more likely than not that Dorsta smelled the scent of narcotics. Ultimately, Officer Hammond could not know what Dorsta was alerting to, but based on her certification and training and his experience with her in the field, he reasonably concluded that there was probable cause to enter the vehicle and search for contraband. Defendants' remaining argument, that the existence of a rental car weighs against a probable cause finding, is unpersuasive and, if credited, would unreasonably put the occupants of rental vehicles in a better position than persons using

14

non-rental vehicles. The mere fact that Defendants were using a rental car does not make Dorsta's alert on the trunk an unreliable indicator of the presence of narcotics.

**D.     The Canine Sniff Did Not Prolong Defendants' Detention.**

Defendants maintain that their constitutional right to be free from unreasonable searches and seizures was violated because their immigration-related detention was prolonged in order to accomplish the open-air dog sniff in the parking lot. In its Caballes opinion, the Supreme Court made it clear that the drug-detection dog-sniff in that case did not extend the duration of the underlying traffic stop. Id. at 407-408. Based on the testimony presented at the hearing, the Government has demonstrated that Defendants were detained for close to three hours for a lawful investigation into an immigration concern. Sometime prior to the conclusion of that investigation, Agent McDonough placed a call to arrange for a detection dog to be run around Defendants' vehicle. Agent McDonough transported Defendants back to the Big Stop parking lot upon deciding that there was no immigration-related basis for further detention and, when they arrived at the parking lot, Officer Hammond and Dorsta were already present and Dorsta had already alerted on the trunk of the vehicle.

**E.     Even if Defendants' Detention was Prolonged for the Open-Air Dog Sniff, the Very Limited Amount of Time and the Non-Invasive Nature of the Open-Air Sniff Would Not Offend the Fourth Amendment Under the Circumstances**

The investigation in this case began with a consensual conversation in a public parking lot, not with a stop based on a show of authority. Thereafter, a seizure arose when Agent McDonough requested Defendants' passports. This seizure was lawful because the Immigration and Nationality Act authorized the detention of Defendants to

15

permit an investigation into their right to be in or remain in the United States. 8 U.S.C. § 1357(a)(1). The exercise of this investigative authority was circumscribed, of course, by the Fourth Amendment. United States v. Brignoni-Ponce, 422 U.S. 873, 878, 883-84 (1975) (holding unconstitutional random immigration stops in "border areas"). "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id. Assuming, for the sake of argument alone, that the detention of Defendants was extended by a few minutes to give Officer Hammond time to run Dorsta around the vehicle, such a limited extension in the duration and scope of the investigation would have been reasonable under the circumstances.

The drug-detection dog sniff took place within two miles of the international border in the context of a legitimate, immigration-related investigation. Running a drug-detection dog around the vehicle was reasonably responsive to this particular immigration investigation in light of Defendants' vague responses to inquiries about their travels, the prior denial of entry to Giuffrida, and Giuffrida's indication that he might buy a new tire for a rental vehicle rather than use a spare. On the one hand, Agent McDonough denied suspicion and testified that he had acquired consent to run a dog around the vehicle. On the other hand, he also testified about the denial of Giuffrida's entry in New York and the basis for that denial, the Defendants' vague responses about their travels, and how strange it seemed to him that Giuffrida would want to buy a new tire for a rental vehicle. These atypical circumstances related to two foreign nationals within two miles of the

international border crossing would reasonably support a brief delay to permit border agents to run a detection dog around Defendants' vehicle, regardless of how Agent McDonough characterized his level of suspicion at the hearing.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court DENY Defendant Mouneimneh's Motion to Suppress (Doc. No. 56) and DENY Defendant Giuffrida's Motion to Suppress (Doc. No. 61).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 19, 2012